UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| SATYABRATA CHATTERJEE, M.D. and ASHWINI ANAND, M.D., | ) ) ) | |
| Plaintiffs, | ) ) | No. 6:19-CV-212-REW |
| v. | ) ) | OPINION AND ORDER |
| CBS CORPORATION and CBS NEWS, INC., | ) ) ) | |
| Defendants. | | |

*** *** *** ***

## I. BACKGROUND

The origins of this defamation and false-light lawsuit date back to 2011, when three Lexington cardiologists brought a *qui tam* suit against St. Joseph London Hospital; physicians Satyabrata Chatterjee, Ashwini Anand, and Sandesh Patil; and other entities associated with the hospital or the physicians. *See* DE 10-2 (Exhibit 3, First Amended Complaint) ¶¶ 1–7, 12–25. The Lexington cardiologists—relators, in the *qui tam* action—noticed a trend among some of their patients that appeared to have received unnecessary heart treatment at the hospital or one of the named clinics. *Id.* ¶¶ 68–108. In their whistleblower complaint, the relators alleged that all defendants had violated three provisions of the False Claims Act,[1] as well as the Anti-Kickback

---

[1] The False Claims Act protects public healthcare programs by prohibiting "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval." *See* 31 U.S.C. § 3729(a)(1)(A). The Act also criminalizes "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim," § 3729(a)(1)(B), and conspiring to violate (A) or (B), among other subsections, § 3729(a)(1)(C).

1

Statute[2] and the Stark Law.[3] DE 10-2 ¶¶ 113–43. The Department of Justice eventually intervened in parts of the suit. *Id.* (Exhibit 4, Notice of Election to Intervene) at 84–86. The action ended in 2014, when the government settled with the hospital and with Chatterjee and Anand. *See id.* (Exhibits 1 and 2, Department of Justice press releases discussing each settlement) at 6–7, 9–10.

Years later, CBS planned an investigative story. By July 2018, correspondence reveals that CBS News and counsel for Chatterjee and Anand had discussed the possibility of an interview with the physicians. *See id.* (Exhibit 10) at 107. Those discussions stalled. *See* DE 1-1 at 28 ("Drs. Anand and Chatterjee declined CBS News' request for an interview."); DE 10-2 at 107. Later that month, Alex Ferrer, a reporter with CBS News, approached Chatterjee in the parking lot of St. Joseph London Hospital and posed several questions about the alleged conduct that had been the subject of the *qui tam* suit. *See* DE 1-1 at 28–29; DE 10-2 at 107. Chatterjee directed Ferrer to speak with Chatterjee's attorney and responded in the negative when Ferrer asked if Chatterjee had prior knowledge about unnecessary cardiac procedures. DE 1-1 at 28; DE 10-2 (Exhibit 9). The physicians, through counsel, did provide a "statement and response" to CBS News on July 30, 2018. DE 10-2 at 107–12. In relevant part, the letter stated that "[t]he resolution of the Qui Tam case against the Physicians solely stems from a business arrangement in existence from 2008-2012." *Id.* at 109. The letter focused on "personal Integrity Agreements"—which arose from the settlement between the government and Chatterjee and Anand and required internal compliance reforms and third-party oversight, *see id.* (Exhibit 2) at 9–10—and characterized the settlement as

---

[2] "The Anti-Kickback Statute prohibits offering, paying, soliciting or receiving remuneration to induce referrals of items or services covered by federal health care programs, including Medicare." DE 10-2 at 9; *see* 42 U.S.C. § 1320a-7b.

[3] "The Stark Law forbids a hospital from billing Medicare for certain services referred by physicians who have a financial relationship with the entity." DE 10-2 at 9; *see* 42 U.S.C. § 1395nn.

"based purely on alleged violations of the [Stark Law.]" *See id.* at 109. The statement concluded with the contention that "[t]he Physicians are innocent collateral victims of the conduct of Drs. Patil and Chalhoub." *See id.* at 110. Patil and Chalhoub faced federal criminal charges and, ultimately, conviction for their involvement. *See* DE 1-1 at 27.

On August 3, 2018, CBS News aired a segment entitled "Case Against the Cardiologists" as a part of its *Whistleblower* series. *See* DE 1-1 ¶ 8; DE 10-2 (Exhibit 9). The segment featured Dr. Robert Jones, one of the Lexington cardiologists behind the *qui tam* suit years earlier. *See* DE 1-1 at 10–23. In response to questions from Ferrer, Dr. Jones and former U.S. Attorney Kerry Harvey related the events leading up to the suit and its resolution, including intervention by the Department of Justice and the settlements. *See id.* at 10–27. The segment also included a clip from Ferrer's interaction with Chatterjee in the hospital parking lot and quoted part of the physicians' July 30, 2018, written statement to CBS News. *See id.* at 28–29 ("In a statement, an attorney for Drs. Chatterjee and Anand said in part, the physicians are innocent collateral victims of the conduct of Drs. Patil and Chalhoub. Their dedication to providing the highest quality of cardiac care has remained steadfast and has been consistently vindicated by the legal system."). CBS also posted Plaintiffs' statement on the *Whistleblower* website. DE 10-1 at 15.

On September 21, 2018, Plaintiffs' counsel sent a letter, identified as a "demand for correction," to CBS News. DE 1-1 at 33–40. The letter excerpted and bolded portions of the *Whistleblower* broadcast, which Plaintiffs identified as "specific false and defamatory statements." *Id.* at 35–39.

> MR. FERRER: Almost a year after Dr. Jones began seeing those desperate patients, he, Dr. Hollingsworth, and another partner, filed a federal whistleblower lawsuit against Saint Joseph and three cardiologists, Sandesh Patil, Satyabrata Chatterjee, and Ashwini Anand. [DE 1-1 at 23]
> ****

> MR. FERRER: Federal investigators dug in and focused on the relationship between Saint Joseph London Hospital and heart clinic administrators, Drs. Chatterjee and Anand.
>
> MR. HARVEY: They essentially had an exclusive arrangement for cardiac services with this particular hospital.
>
> MR. FERRER: **The feds found that at the core of it all was greed**. A high profit item for hospitals and doctors, **those tiny stents**. [DE 1-1 at 24]
>
> ****
>
> MR. FERRER: Drs. Chatterjee and Anand were never charged with any crimes but agreed to pay the Government $380,000 for **allegedly fraudulent contracts with the hospital**. They admitted no wrong-doing. And as CBS News found, they're back in London, Kentucky, seeing patients at their own heart clinics.
>
> MR. HARVEY: And I hope that the appropriate authorities are monitoring that very carefully.
>
> MR. FERRER: Drs. Anand and Chatterjee declined CBS News' request for an interview. So we went to Kentucky.
>
> Let's go. And found Dr. Chatterjee as he was entering of all places, Saint Joseph London Hospital.
>
> Dr. Chatterjee, hi, Alex Ferrer with CBS News. We'd like to talk to you about **your involvement with the unnecessary heart procedures** that were performed at Saint Joseph Hospital London. What do you say to the **patients who received some unnecessary heart procedures**?
>
> DR. CHATTERJEE: I prefer you just talk to my attorney. He has told me not to talk, so I would prefer you would do that.
>
> MR. FERRER: You're still a cardiologist?
>
> DR..CHATTERJEE: Yes, sir.
>
> MR. FERRER: You think it's fair for patients to wonder if they should put their life in your hands if you're [sic] clinic was employing doctors who were **performing unnecessary procedures**? Did you know that these doctors were doing this? [DE 1-1 at 27–29]

Plaintiffs demanded correction on two main points: the "suggest[ion] [that] the Physicians performed and profited from unnecessary cardiac procedures, specifically the placement of stents," and the "state[ment] that the Physicians paid the federal government $380,000 for 'allegedly fraudulent contracts with the hospital.'" *See id.* at 36. The demand incorporated the physicians' earlier written statement, in which they had denied performing unnecessary cardiac procedures or profiting from unnecessary procedures performed by others, and pointed to the lack of criminal charges against Chatterjee and Anand and their apparent vindication in civil malpractice suits. *See id.* at 37. As far as the allegedly fraudulent contracts, the demand again referenced the physician's

earlier written statement, highlighting the outcomes of the criminal and civil proceedings against Chatterjee and Anand. *See id.* at 38–39. The statement emphasized the favorable termination of the criminal investigation and the limited scope of the personal integrity agreements. *See id.* CBS rejected the request. *See* DE 17-5 at 1–3.

Based on these facts,[4] Plaintiffs filed suit in Laurel Circuit Court against CBS Corporation and CBS News, Inc., claiming defamation, defamation *per se*, and false light invasion of privacy. *Id.* ¶¶ 17–19. Defendants[5] timely removed the action, DE 1, and now pursue Rule 12 dismissal of all claims, DE 10 (Motion). The motion stands fully briefed and ripe for review. DE 17 (Response); DE 22 (Reply).

After removal, the Court ordered Defendants to clarify the full basis for diversity jurisdiction, as the notice of removal and complaint addressed Plaintiffs' residence rather than citizenship. DE 26. "[S]ubject matter jurisdiction under 28 U.S.C. § 1332(a)(1) requires that the parties be both citizens of the United States and domiciliaries of individual states." *Farmer v. Fisher*, 386 F. App'x 554, 557 (6th Cir. 2010). "[D]omicile is established by physical presence in a place in connection with a certain state of mind concerning one's intent to remain there." *Miss. Band of Choctaw Indians v. Holyfield*, 109 S. Ct. 1597, 1608 (1989). Defendants responded by providing court filings (including Plaintiffs' answer in another lawsuit, in which Plaintiffs acknowledged their Kentucky residence and citizenship) and official records that effectively demonstrate Plaintiffs' long-standing attachment to London, Kentucky. *See* DE 27. The Court

---

[4] Although Plaintiffs focused on specific statements in the correction request, the Complaint attached a proffered transcript of the entire segment addressing the cardiologists. This gives complete context for each remark.

[5] Defendants' notice of removal clarifies that CBS Broadcasting Inc. is the proper defendant, as it is the direct parent of CBS News, Inc. *See* DE 1 at 2 n.1, 3 ¶ 6. The parties should cooperate to ensure that the proper entity is before the Court.

takes judicial notice of these filings and records and finds that there is diversity-based subject-matter jurisdiction because of Plaintiffs' Kentucky citizenship.

## II. STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 127 S. Ct. 1955, 1974 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* However, "a formulaic recitation of a cause of action's elements will not do[.]" *Twombly*, 127 S. Ct. at 1965. Courts "must construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012). Yet, courts need not accept "legal conclusion[s] couched as [] factual allegation[s]." *Papasan v. Allain*, 106 S. Ct. 2932, 2944 (1986). The Court evaluates and tests the well-pleaded Complaint contents. *Peterson v. Ostrander*, No. 17-2160, 2018 WL 4739692, at *2 (6th Cir. Apr. 6, 2018) ("[T]he court must confine its analysis to the pleadings and accept all well-pleaded allegations as true.").

Hinging on Rule 8's minimal standards, *Twombly* and *Iqbal* require a plaintiff to "plead facts sufficient to show that her claim has substantive plausibility." *Johnson v. City of Shelby*, 135 S. Ct. 346, 347 (2014). Where plaintiffs state "simply, concisely, and directly events that . . . entitle[] them to damages," the rules require "no more to stave off threshold dismissal for want of an adequate statement[.]" *Id.*; *El-Hallani v. Huntington Nat. Bank*, 623 F. App'x 730, 739 (6th Cir. 2015) ("Although *Twombly* and *Iqbal* have raised the bar for pleading, it is still low.").

Generally, "matters outside of the pleadings are not to be considered" by a court in ruling on a motion to dismiss. *Hammond v. Baldwin*, 866 F.2d 172, 175 (6th Cir. 1989). But, "a document

that is not formally incorporated by reference or attached to a complaint may still be considered part of the pleadings." *Greenberg v. Life Ins. Co.*, 177 F.3d 507, 514 (6th Cir. 1999). When a complaint refers to a document that is "central to the plaintiff's claim, . . . the defendant may submit an authentic copy to the court to be considered on a motion to dismiss, and the court's consideration of the document does not require conversion of the motion to one for summary judgment.'" *Id.* The Court may also consider public records or materials that "are otherwise appropriate for the taking of judicial notice." *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 467 (6th Cir. 2011) (internal quotation marks and citation omitted).

At the threshold, the parties dispute the class of documents that the Court may here consider. Plaintiffs attached two exhibits to the complaint: a transcribed version of the broadcast and their September 21, 2018, demand for correction. *See* DE 1-1 at 9–40. These materials are indisputably within the scope of the pleadings. *See Cates v. Crystal Clear Techs., LLC*, 874 F.3d 530, 536 (6th Cir. 2017) ("The law is clear that [courts] may consider [a document] which was attached to the [c]omplaint . . . in determining whether dismissal is proper.") (internal citation omitted).

But, Plaintiffs argue that the Court may not consider the exhibits attached to the motion to dismiss, as those documents are "outside the pleadings." *See* DE 17 at 9. Defendants attached ten exhibits: two Department of Justice press releases about the settlements, the first amended complaint in the *qui tam* case, the government's notice of election to intervene in the case, four contemporaneous news stories about the settlements, a DVD containing a copy of the broadcast, and the July 30, 2018, letter from Plaintiffs' counsel to CBS News. DE 10-2 at 2–4 (Declaration of Hon. Leita Walker identifying the exhibits). Plaintiffs express no concern about the authenticity of any of these exhibits. *See* DE 17 at 9. In response to Defendants' motion to dismiss, Plaintiffs

(inconsistently, perhaps) attached additional documents: the notice of settlement between the government and Chatterjee and Anand as well as their settlement agreement, the joint stipulation of dismissal and agreed order of dismissal; CBS's September 28, 2018, response to Plaintiffs' demand for correction; an email from one of the federal prosecutors regarding Chatterjee and Anand's settlement; and a letter from another prosecutor clarifying the status of the criminal investigation of Chatterjee and Anand. DE 17-1; DE 17-2; DE 17-3; DE 17-4; DE 17-5; DE 17-6; DE 17-7.

Plaintiffs' complaint and attachments create a complicated chain of internal citations: the complaint identifies the particular defamatory statements only by reference to the (attached) demand for correction, which itself incorporates and quotes at length from Plaintiffs' (unattached) July 30, 2018, statement (identified as the "Physicians' Statement"). *See* DE 1-1 (Complaint) ¶ 22 (attaching the demand for correction as Exhibit 2); DE 1-1 at 37 ("The Physicians' Statement, which is fully incorporated by reference here. . . ."). The complaint also mentions CBS's response to Plaintiffs' demand for correction. *See* DE 1-1 ¶ 23. A central purpose of the demand for correction is to provide the claimed true facts, *see* KRS 411.061, which the Physicians' Statement supposedly accomplishes. The Court views the Physicians' Statement and CBS's September 28, 2018, response to Plaintiffs' demand for correction as part of the pleadings. These documents are central to the defamation claim and the fair-report privilege at issue. Moreover, an attachment to the complaint—part of the pleadings—explicitly incorporates the Physicians' Statement by reference. *See* DE 1-1 at 37.

The Court will also consider the following public records attached to the parties' motions because they are integral to Plaintiff's defamation claim: the press releases, the *qui tam* complaint and notice of government intervention, and the court filings related to settlement. Additionally, the

settlement agreement and the actual recording of the broadcast (provided by Defendants on a DVD) together go to the heart of Plaintiffs' claims, which hinge on how CBS News presented the allegations of wrongdoing against Chatterjee and Anand and how the physicians resolved those allegations. Authenticity is not a raised issue, and most if not all of the documents would, given the nature of the papers, be proper candidates for judicial notice. At this stage, the Court need not consider the news stories (provided by Defendants) and declines to consider the two non-public communications (DE 17-6 and DE 17-7, provided by Plaintiffs).

### III. ANALYSIS

The Court accepts that the five listed statements are the claim triggers here. That is CBS's argument, and Plaintiffs do not contest the roster of assertions for analysis. Again, though, each remark has a context within the story, which the Court must account for. Defendants seek dismissal for four reasons: none of the challenged statements is libelous *per se*, and Plaintiffs failed to plead special damages; the fair-report privilege protects the statements; the statements are not defamatory statements of fact or not materially false; and Plaintiffs failed to state a claim for false light invasion of privacy. *See* DE 10-1. In response, Plaintiffs focus on the precise terms of the settlement agreement following the *qui tam* case and maintain that they adequately pleaded special damages, malice, and false light invasion of privacy. *See* DE 17. Plaintiffs argue that the fair-report privilege does not permit dismissal at this stage and that all five of the challenged statements constitute defamation *per se*. *See id.*

Each side is partly correct. As discussed below, the fair-report privilege does not shield Defendants, at the Rule 12 stage and on this record, from potential liability. And, the broadcast did publish one statement (Comment 1) that could constitute defamation *per se* (thus obviating the special-damages limitation). Dismissal is warranted on Plaintiffs' claims to the extent they are

grounded in the four other excerpts; the other challenged material is either demonstrably accurate or does not include a defamatory statement of fact. Plaintiffs' defamation and false-light claims pass Rule 12 muster, but only as to the excerpt relating to greed and high-profit stents. The Court explains.

## A. Kentucky's Fair-Report Privilege[6]

The fair-report statutory privilege limits libel actions based on "fair and impartial" reports of "any indictment, warrant, affidavit, pleading or other document in any criminal or civil action in any court of competent jurisdiction." *See* KRS 411.060. "The privilege is qualified or conditioned upon the report being fair and accurate and not being maliciously made." *Smith v. Martin*, 331 S.W.3d 637, 641 (Ky. Ct. App. 2011) (addressing like legislative or executive privilege). "The privilege is not lost if the newspaper fails to print the exact facts so long as what it does print is substantially true." *Pearce v. Courier-Journal*, 683 S.W.2d 633, 635 (Ky. Ct. App. 1985). "[T]he report is considered 'maliciously made' if it is published 'solely for the purpose of causing harm to the person defamed.'" *Smith*, 331 S.W.3d at 641 (internal quotation omitted). The plaintiff ultimately bears the burden to "show[] that either there was no privilege under the circumstances or that it had been abused." *Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 284 (Ky.

---

[6] The Court applies Kentucky's choice-of-law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 61 S. Ct. 1020, 1021 (1941). In general, "Kentucky's choice-of-law rules favor the application of its own law." *Boling v. Prospect Funding Holdings*, LLC, 771 F. App'x 562, 574 (6th Cir. 2019). Kentucky courts use a "significant contact" approach to tort cases. *Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009). Under this test, "any significant contact with Kentucky [is] sufficient to allow Kentucky law to be applied." *Bonnlander v. Leader Nat'l Ins. Co.*, 949 S.W.2d 618, 620 (Ky. Ct. App. 1996). Here, Plaintiffs' Kentucky citizenship justifies the application of Kentucky law. *See* Restatement (Second) of Conflict of Laws § 150 (Multistate Defamation); *id.* § 153 (Multistate Invasion of Privacy); *cf. Young v. That Was The Week That Was*, 312 F. Supp. 1337, 1339 (N.D. Ohio 1969) ("Most courts considering the choice of law in right of privacy cases have applied the law of the plaintiff's residence, since that is the jurisdiction in which the plaintiff sustained his injury."). No party engages in the full analysis.

2014). As a pleading matter, the fair-report privilege is treated as a defense. *See Desai v. Charter Commc'ns, LLC*, 381 F. Supp. 3d 774, 790–91 (W.D. Ky. 2019); *Toler*, 458 S.W.3d at 284 (referring to qualified privilege as a "defense"); *Columbia Sussex Corp. v. Hay*, 627 S.W.2d 270, 275–76 (Ky. Ct. App. 1981) (same).

That the fair-report privilege acts like a defense[7] logically may circumscribe its role at the Rule 12 stage. For example, "it generally is not appropriate to grant a Rule 12(b)(6) motion to dismiss on the basis of an affirmative defense, because a plaintiff ordinarily has no obligation to plead around this affirmative defense in order to state a viable claim." *Geico Corp. v. Autoliv, Inc.*, 345 F. Supp. 3d 799, 833 (E.D. Mich. 2018). "But there is no reason not to grant a motion to dismiss where the undisputed facts conclusively establish an affirmative defense as a matter of law." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 613 (6th Cir. 2009). This principle applies in the statute-of-limitations context. If the complaint's allegations "affirmatively show that the claim is time-barred," then dismissal under Rule 12(b)(6) is appropriate. *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012).

Kentucky courts do not typically require defamation plaintiffs to plead around qualified privileges in general or the fair-report privilege in particular. *Cf. Toler*, 458 S.W.3d at 284–85 (describing qualified-privilege analysis for purposes of summary judgment or directed verdict); *Smith*, 331 S.W.3d at 641–42 (remanding for determination of whether report was fair and accurate and whether report was maliciously made). Rather, the cases recognize that a qualified privilege may defeat a defamation claim as a matter of law if the plaintiff cannot "adduce such evidence sufficient to create a genuine issue of fact" about whether the defendant had abused and therefore

---

[7] The fair-report privilege is atypical, as far as defenses go, because the plaintiff ultimately bears the burden to establish an unprivileged communication.

waived the privilege. *See Harstad v. Whiteman*, 338 S.W.3d 804, 810–11 (Ky. Ct. App. 2011). Though courts have affirmed dismissals based on the fair-report privilege, the application of the privilege in those cases depended on undisputed facts. In one case, the privilege barred suit because the defamation plaintiff was "incapable of defeating the defense of substantial truthfulness." *Jones v. Hannah*, No. 2013-CA-000359-MR, 2015 Ky. App. Unpub. LEXIS 1, at *6 (Ky. Ct. App. Jan. 9, 2015). Jones had pleaded guilty to sexual misconduct, and her lawyer stated—falsely, though inadvertently—that intercourse had occurred four or five times. *Id.* at *1–2, 4–6. Jones unsuccessfully challenged dismissal of her suit against the reporters who covered Jones's guilty plea and repeated the apparently incorrect figure. *See id.* at *1–2, 6–7. In another instance, privilege-based dismissal was warranted because the defamation plaintiff had neither alleged maliciousness nor requested an explanation or contradiction. *See Akins v. News Enter.*, No. 2009-CA-002188-MR, 2011 Ky. App. Unpub. LEXIS 954, at *1–4, 6–7 (Ky. Ct. App. Jan. 28, 2011). The Court's concern is treating the privilege as definitively operative on the thin record and low bar of Rule 12. Several matters counsel denial of the request.

The Court finds the record and posture poorly suited for privilege-based dismissal. First, CBS pins its privilege on alleged fair reporting about the *qui tam* First Amended Complaint and DOJ press releases. *See* DE 10-1 at 24–25. Although a complaint synopsis clearly would be within KRS 411.060, the Court has significant doubt about reporting on press releases.[8] Those later extra-

---

[8] Claiming that privilege protects a report on a third party's report resembles the doctrine of neutral reportage, which Kentucky courts have rejected. *See McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882, 886–87 (Ky. 1981); *see also Sandmann v. WP Co. LLC*, 401 F. Supp. 3d 781, 789 (E.D. Ky. 2019) ("Kentucky has rejected the doctrine of 'neutral reportage'; that is, a newspaper may still be held liable for quoting 'newsworthy statements' of third parties.").

proceeding documents are not ones "in any court of competent jurisdiction" and thus likely fall outside the Kentucky statutory boundary.[9]

Further, the Court perceives questions about the fairness and accuracy of the reporting relative to the cited documents. As the next discussion shows, the story at issue (plausibly read) directly links Plaintiffs to profiting from unnecessary and invasive stent procedures. The story suggests that as the federal government's conclusion. Whether the documents (the First Amended Complaint, which pre-dated intervention) and the press releases bear that interpretation may well be a matter for the trier of fact. Such is the typical duty allocation under Kentucky law. *See Kremer v. Kopmeyer*, 418 S.W.2d 237, 240 (Ky. 1967) (citing need for jury evaluation of report accuracy). Dismissal would be premature under the Rule 12 standard.

Next, the Complaint does twice explicitly reference common law malice. *See* DE 1-1 ¶¶ 16, 21. CBS touts this as the proper standard. The Court finds the direct allegation of common law malice, a term of art implicating the *Pearce* measure, and given the provided full transcript, the correction letter, and CBS's rejection, as providing a plausible factual framework regarding malice. *See also* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). If CBS knew that Plaintiffs denied any profit relationship to improper procedures, knew the full investigative outcome, and yet directly included that allegation, the scenario could plausibly result in a malice finding. The confrontation of

---

[9] The cases cited by Defendants do not persuade otherwise. In *Alsop v. Cincinnati Post*, 24 F. App'x 296, 297-98 (6th Cir. 2001), the Sixth Circuit interpreted the Ohio fair-report privilege to apply to a news report about a press release. Though the Ohio and Kentucky fair-report privileges are substantially similar, *compare* KRS 411.060, *with* Ohio Rev. Code § 2317.05, such that *Alsop*'s reasoning might otherwise be persuasive, *Alsop* did not analyze or explain why such a report falls within the scope of the privilege. *See Alsop*, 24 F. App'x at 297-98. Defendant's other case, *Robison v. Watson*, No. 2010-211 (WOB-CJS), 2012 WL 4217050, merely applied the privilege to statements within a press release, *not* a report on a press release. *See id.* at *8.

Chatterjee (despite an express prior refusal to comment) contributes here. Again, Kentucky typically assigns this evaluation, one of the speaker's actuating motive, to the finder of fact. *Kremer*, 418 S.W.2d at 240 ("[T]he motive by which the defendant was actuated must be determined by the triers of fact whenever the evidence raises the issue.").

Finally, even if CBS otherwise toggled the privilege elements, KRS 411.060 has alternative privilege exceptions. Thus, even absent malice, the privilege textually does not apply if "the defendant after request by the plaintiff has failed to publish a reasonable explanation or contradiction" with equivalent prominence. CBS argues against textual fidelity here, but the Court will of course follow the statute. CBS denied a post-broadcast correction in this case, and the standards of the exception require further exploration.

For each of these reasons, the Court rejects the statutory privilege at this juncture.

**B. Defamation**

"The requisite elements for a defamation claim are: '(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.'" *Toler*, 458 S.W.3d at 281–82 (quoting Restatement (Second) of Torts § 558). The fourth element acknowledges that there are two classes of "actionable words": "those actionable per se which necessarily damage plaintiff; and . . . those which are actionable in consequence of extrinsic facts showing the circumstances under which they were written or spoken and the damages resulting therefrom." *See Digest Publishing Co. v. Perry Publishing Co.*, 284 S.W.2d 832, 834 (Ky. 1955); *Gilliam v. Pikeville United Methodist Hosp. of Ky., Inc.*, 215 S.W.3d 56, 61 (Ky. Ct. App. 2006). An action based on this second class of words requires a showing of special damages, which are "those

beyond mere embarrassment which support actual economic loss." *Hay*, 627 S.W.2d at 274.

Special damages "must be a loss of pecuniary character, or the loss of some substantial or material advantage." *Williams v. Riddle*, 140 S.W. 661, 664 (Ky. 1911).

Whether words qualify as defamation *per se* is a question of law. *See Baker v. Clark*, 186 Ky. 816, 820–21 (Ky. 1920). A statement is defamatory when "it tends to (1) bring a person into public hatred, contempt or ridicule; (2) cause him to be shunned or avoided; or, (3) injure him in his business or occupation." *McCall*, 623 S.W.2d at 884. "The alleged defamatory words must be measured by their natural and probable effect on the mind of the average lay reader and not be subjected to the critical analysis of the legal mind." *Id.*; *see also Marcus & Millichap Real Estate Inv. Brokerage Co. v. Skeeters*, 395 F. Supp. 2d 541, 554 (W.D. Ky. 2005) ("A defamatory statement is measured by looking at the publication as a whole to gage the effect on the average reader.").

Here, Comment 1, in context, supports a plausible defamation claim. *See* DE 1-1 at 24 ("The feds found that at the core of it all was greed. A high profit item for hospitals and doctors, those tiny stents."). As Kentucky law instructs, the Court assesses the language within the overall published piece. *See McCall*, 623 S.W.2d at 884. The story, to the point of Comment 1, had focused almost exclusively on unnecessary cardiac procedures. Immediately prior to Comment 1, the reporter displayed and described the use of a "stent." After describing the extent of "unindicated procedures" found and suspected, the reporter then described the Justice Department's process and findings:

> MR. FERRER: Federal investigators dug in and focused on the relationship between Saint Joseph London Hospital and heart clinic administrators, Drs. Chatterjee and Anand.
> MR. HARVEY: They essentially had an exclusive arrangement for cardiac services with this particular hospital.

MR. FERRER: **The feds found that at the core of it all was greed**. A high profit item for hospitals and doctors, **those tiny stents**.

MR. HARVEY: For a stent procedure, you're probably looking at somewhere around $12,000 to $15,000; the physician's payment, maybe $1,500 or so. If you are inclined to do these procedures on a wholesale basis that are unnecessary, there's a lot of money to be made.

MR. FERRER: In 2014, more than three years after Dr. Jones' pursuit began, the hard work finally paid off. U.S. Attorney Carey Harvey announced that the DOJ was joining the case.

MR. HARVEY: When we investigated the claims he made, he was right. People were undergoing interventional procedures. Their body was being invaded to have things done to them that were unnecessary, simply for the money. And that's truly monstrous behavior.

DE 1-1 at 24–25, 35.

Comment 1 (bolded per Plaintiffs' own retraction letter) credibly carries a defamatory meaning. The quoted part of the story conveys that the DOJ dug in and "focused on the relationship between" Saint Joseph Hospital (the hospital) and clinic administrators, Plaintiffs here, Anand and Chatterjee. U.S. Attorney Harvey's intervening quote points out that they "had an exclusive arrangement for cardiac services with this particular hospital." Next, reporter Ferrer immediately says, "The feds found that at the core of it all was greed. A high profit item for hospitals and doctors, those tiny stents." What is the "it" in "core of it all"? The immediate antecedent is "the exclusive arrangement" between Plaintiffs and the hospital. The core was greed, greed specific to profitability of stents. The narrative pivots to Harvey's description of the economics, with the ominous reference to the money to be made from conducting "on a wholesale basis" procedures "that are unnecessary." Harvey repeats the DOJ's confirmatory findings—interventional procedures had occurred "that were unnecessary, simply for the money. And that's truly monstrous behavior." This depicts Plaintiffs as at the core of conduct, focused on by authorities, that featured

wholesale invasive procedures motivated not by patient need but by avaricious billing for "those tiny stents."[10]

At least under review at the Rule 12 stage, the Court views the allegations as supporting a plausible claim. The essence of Comment 1 fairly attributes unnecessary stent procedures and the "monstrous" doctoring associated with it to the "exclusive arrangement" between the hospital and Plaintiffs. If the chronicle describes the doctors as engaging in professional behavior portrayed as monstrous, the language is defamatory. *See McCall*, 623 S.W.2d at 884.

Indeed, the construct crosses the line as defamatory *per se*. The report does not attribute crime to Plaintiffs, but that is not the Kentucky threshold. Kentucky defines the standard as follows: "Statements classified as defamatory per se include those which attribute to someone a criminal offense, a loathsome disease, serious sexual misconduct, or conduct which is incompatible with his business, trade, profession, or office." *Gilliam*, 215 S.W.3d at 61. False statements impinging on a person's fitness to perform a job fall squarely within the scope of defamation *per se*. *See Toler*, 458 S.W.3d at 282 ("One example of this per se classification is a communication involving false allegations of unfitness to perform a job.").

Surely, attributing a doctor's choice of fee over patient welfare qualifies as a direct and actionable stain on a physician's professional standing. Reporter Ferrer's later questioning proves the inductive link: he confronted Chatterjee about the connection between patient trust and the swirling allegations ("You think it's fair for patients to wonder if they should put their life in your hands if you're [sic] clinic was employing doctors who were performing unnecessary procedures? Did you know that these doctors were doing this?"). The question, though a fair one, itself shows

---

[10] This all may well be true, which would doom any claim. Now is not the time for that analysis on Comment 1, under the Rule 12 standard and this record.

the shadow cast on a doctor suspected of greedily performing unwarranted surgeries. Because Comment 1, as a direct factual matter,[11] links Plaintiffs to such conduct, the Complaint states an actionable claim. *See Sandmann*, 401 F. Supp. 3d at 795 (collecting examples of defamation *per se*, including accusations against attorneys for "fixing" cases or freeing criminals).

On the other hand, Comments 3, 4 and 5 (really, Questions) cannot form the basis for a defamation claim. Plaintiffs fault CBS for Ferrer's "ambush" interview with Chatterjee in the hospital parking lot, but this recorded interaction reveals no defamatory statement of fact. Ferrer thrice mentions "unnecessary heart procedures" or "unnecessary procedures." Plaintiffs claim that "the broadcast suggests that the Physicians both performed unnecessary stent procedures and profited from unnecessary stent procedures performed by other physicians (presumably Drs. Patil and Chalhoub)." DE 1-1 at 36–37. Yet, none of the targeted excerpts does this. Take the first two snippets: *"We'd like to talk to you about your involvement with the unnecessary heart procedures that were performed at Saint Joseph Hospital London. What do you say to the patients who received some unnecessary heart procedures?" Id.* at 28–29. The first, declarative sentence does not presuppose that Chatterjee had any involvement with the procedures, as further evidenced by the passive voice ("unnecessary heart procedures that *were performed*"). Nor does the interrogative sentence. Ferrer references "the patients," not "your patients," and the clause has no agent; it does not identify Chatterjee or anyone else as the performer of the procedures. Plaintiffs' showing based on the third and fourth sentences fares no better. *"You think it's fair for patients to wonder if they should put their life in your hands if you're [sic] clinic was employing doctors who were performing unnecessary procedures? Did you know that these doctors were doing this?" Id.*

---

[11] This is more than a mere allegation of greed. The full context explains the factual allegation— the freight behind "those tiny stents"—leading to the opprobrious assessment. It is the factual attribution the Court treats as arguably defamatory *per se*.

Through this questioning, Ferrer does not assert that Chatterjee himself performed unnecessary procedures or imply that he knew about the doctors who did. The question permits a range of answers (negative included); in fact, Chatterjee denied knowledge, on camera.

Plaintiffs' final (albeit unsuccessful) theory focuses on Comment 2, the statement that Plaintiffs paid $380,000 in a settlement to resolve claims about "allegedly fraudulent contracts with the hospital." *See* DE 1-1 at 27. On this point, Plaintiffs split hairs and ask the Court to engage in "the critical analysis of the legal mind." *See McCall*, 623 S.W.2d at 884. According to Plaintiffs, this excerpt is false and defamatory because the federal investigation involving criminal or False Claims Act violations had ceased and because "[t]he personal Integrity Agreements were based purely on alleged violations of the [Stark Law]." DE 1-1 at 38–39. This facile analysis fails. Through the eyes of an "average lay reader," *McCall*, 623 S.W.2d at 884, Comment 2 is demonstrably accurate. In the "Covered Conduct" identified in the settlement agreement (attached by Plaintiffs to their response), the United States contended that Plaintiffs had "improper financial relationships" with the hospital. *See* DE 17-2 ¶ D.1–2. Through this arrangement, the hospital allegedly compensated Plaintiffs in a duplicative manner or paid them for services "not actually provided" in order to induce referrals to the hospital. *Id.* This conduct, as described, connotes an "improper and tainted" relationship and fairly equates to fraud; the broadcast's characterization was therefore not plausibly false. The settlement definitively was for claims over allegedly fraudulent contracts.

In sum, Plaintiffs' defamation claim based on Comment 1 survives Defendants' motion to dismiss because Plaintiffs have plausibly alleged defamation *per se*.[12] But, the other excerpts do not cross the *Twombly/Iqbal* threshold.

## C. False Light Invasion of Privacy

"The purpose of a false light action is to protect the individual in not being made to appear before the public in an unreasonably objectionable false light and otherwise than as he is." *McCall*, 623 S.W.2d at 888 n.9. "The two basic requirements to sustain such an action are: (1) the false light in which the other was placed would be highly offensive to a reasonable person, and (2) the publisher had knowledge of, or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other was placed." *Id.* at 888.[13]

Here, for many of the same reasons discussed above, Comment 1 crosses the threshold for false light invasion of privacy. Plaintiffs allege that Defendants published matter that would "cast [Plaintiffs] in a false light(s) that would be highly offensive to a reasonable person." *See* DE 1-1 ¶ 14. The broadcast's description of the "monstrous behavior" of performing unnecessary cardiac procedures, which a viewer could reasonably understand Comment 1 to attribute to Plaintiffs, casts Plaintiffs in a potentially false and highly offensive light. Plaintiffs likewise contend that

---

[12] The Court agrees that Plaintiffs failed to plead special damages; this would foreclose a defamation per quod theory under Kentucky law. *See Hay*, 627 S.W.2d at 274 (establishing pleading requirement). The Court does not view the omission as fatal, because Plaintiffs did comply (arguably at least) with the correction statute and do target a statement that bears a defamation *per se* meaning.

[13] As Defendants argue, the public interest nature of the subject matter leads to application of actual malice under *New York Times Co. v. Sullivan*, 84 S. Ct. 710 (1964). *See McCall*, 623 S.W.2d at 885 ("Actual malice requires a showing of knowledge of falsity of the defamatory statement or reckless disregard of its truth or falsity."). The Court defers this analysis under Rule 12. Plaintiffs did allege actual malice. *See* DE 1-1 ¶ 16. Again, given the exchange of information pre-publication and post-publication, and the plausible Comment 1 reading, the Court sees the claim as sufficient at this point in the case.

Defendants acted with a culpable mental state: actual knowledge or at least reckless disregard as to falsity. *See id.* ¶ 15. Plaintiffs' false-light claim, to the extent it relies on Comment 1, withstands dismissal.[14]

However, Comments 2 through 5 cannot support this claim. Without the publication of provably false information, there can be no false light invasion of privacy. *See Cromity v. Meiners*, 494 S.W.3d 499, 505 (Ky. Ct. App. 2015) (affirming grant of summary judgment because no challenged statement could be proven false). Comments 3 through 5 are questions or statements that do not assert or imply any facts (and therefore do not create any "light," false or otherwise). Comment 2 is demonstrably true, by Plaintiffs' own account and attached exhibits. Therefore, these excerpts are inadequate under a false-light theory.

## IV. CONCLUSION[15]

For the above reasons, the Court **ORDERS** as follows:

1.  The Court **GRANTS** in part and **DENIES** in part DE 10; and

2.  The Court **DISCHARGES** the show-cause order (DE 26).

This the 6th day of February, 2020.

Signed By:

*Robert E. Wier*

**United States District Judge**

---

[14] The Court, for now, allows Plaintiffs to proceed on both the defamation and false-light theories. Plaintiffs may not recover on both. *McCall*, 623 S.W.2d at 888–89 ("An injured party may seek relief through both causes of action, arising out of the same publication, but he is limited to only one recovery.").

[15] The case survives, in part. As to all of the claim elements, given the contractual and other relationships at issue, as well as the long history of the *qui tam*, whether Plaintiffs can successfully run the more arduous rapids of Rule 56 is a significant question for future analysis.